UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:13-cv-01329-RFB-VCF |
| Plaintiff, | |
| v. | **ORDER** |
| $32,750 IN UNITED STATES CURRENCY, | |
| Defendant. | |

## I.   INTRODUCTION

This civil forfeiture case is before the Court on a Motion to Suppress Evidence filed by Claimants Fabian Garcia, Jr. and Fabian Garcia, Sr. ECF No. 22. As will be discussed below, the Court finds that the currency obtained in this case was the fruit of an unlawful search. The Motion to Suppress is therefore granted.

## II.   BACKGROUND

Plaintiff United States of America ("the government") brought this civil forfeiture action on July 25, 2013, asserting that the $32,750 in U.S. currency seized from Garcia, Jr.'s car is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6). Verified Compl., ECF No. 1. On January 6, 2014, Fabian Garcia, Sr. and Fabian Garcia, Jr. filed Verified Claims with the Court. ECF No. 7. Garcia, Sr. claims to be lawful owner of the seized currency, and Garcia, Jr. claims that he was lawful possessor. Id. On January 7, 2015, Claimants filed a Motion to Dismiss, which the Court denied on September 30, 2015. ECF Nos. 20, 26. On August 26, 2015, Claimants filed a Motion to Suppress Evidence pursuant to Supplemental Rule G(8)(a) of the Federal Rules of Civil Procedure. ECF No. 22. The Court held an evidentiary hearing on December 18, 2015 at

which it heard testimony from Detective Ray Schaffner of the Las Vegas Metropolitan Police Department. On March 31, 2016, the Court granted Claimants' Motion to Suppress and stated that it would issue a written order. This Order contains the Court's reasoning for its ruling.

### III.    FINDINGS OF FACT

The Court makes the following findings of fact based upon its assessment of the testimony provided at the evidentiary hearing, including credibility, as well as its assessment of the other documentary evidence presented at the hearing. As noted at the hearing, the Court does not consider any other evidence that may have been attached to motions but was not presented at the hearing.

On March 2, 2013, Detective Ray Schaffner was monitoring traffic in the southbound lanes of Interstate 15 in Las Vegas, Nevada. Detective Schaffner is employed by the Las Vegas Metropolitan Police Department ("Metro") and is a member of the Southern Nevada Drug Interdiction Task Force, which is comprised of both state and federal law enforcement officers. Part of Detective Schaffner's duties include monitoring the highways, stopping vehicles for traffic infractions, and determining if the occupants may be transporting contraband, including narcotics. Detective Schaffner makes approximately 20 to 40 stops in an average week when he is working on the highway. Detective Schaffner deploys his drug-detecting dog, Sally, in approximately ten percent of the vehicle stops he makes on the highway. Detective Schaffner finds contraband in the vehicle in approximately one percent of his highway stops.

At approximately 9:25 p.m. on March 2, 2013, Detective Schaffner began pacing[1] a black Chevrolet Impala traveling southbound on I-15. Detective Schaffner followed the vehicle for two miles and determined that it was traveling 80 miles per hour in an area where the speed limit was 75 miles per hour. Detective Schaffner also twice observed the vehicle drift over the dividing line between its lane and the next lane to the left, which was also a southbound lane, and then come back to its original lane. The driver of the vehicle did not signal on either occasion when it drifted

---

[1] As explained by Detective Schaffner, pacing involves following a vehicle to gauge its speed. The officer drives behind the vehicle and adjusts his or her speed until no distance is gained or lost between the vehicles. This serves to approximate the speed of the vehicle being paced.

into the adjacent lane. After following the vehicle for those two miles, Detective Schaffner activated his red and white lights and pulled the vehicle over to the side of the highway. Detective Schaffner was in his full Metro uniform. His car was unmarked, but was equipped with red and white flashing lights to pull other cars over. Detective Schaffner stopped his own vehicle approximately fifteen feet behind the vehicle he had stopped.

After he pulled the vehicle over, Detective Schaffner approached from the passenger side carrying a flashlight. The vehicle had a Minnesota license plate. There were two individuals in the vehicle; Fabian Garcia, Jr. was in the driver's seat and Evan Machacek was in the front passenger's seat. Detective Schaffner had no prior information about these individuals and had not received any tips about them. Detective Schaffner identified himself and informed Garcia that he had been stopped for traveling 80 miles per hour in a 75 mile-per-hour zone and for failure to maintain his lane on two occasions. Garcia[2] apologized for speeding and told Detective Schaffner he was just moving with the flow of traffic. Garcia also informed Detective Schaffner that he swerved across the lane divider because his friend, Machacek, was ill and had been vomiting. Detective Schaffner shined his flashlight inside the vehicle and saw a white bucket between the two front seats that appeared to contain vomit.

Detective Schaffner asked Garcia where he was traveling from. Garcia responded that he and Machacek were coming from Maple Grove, Minnesota and were on their way to Santa Maria, California to attend a funeral service for Garcia's grandfather who had died two weeks earlier. Detective Schaffner asked several other routine questions, including whether Garcia had a driver's license. When he was asked whether he had a driver's license, Garcia audibly sighed, looked down, and then said "I'm not going to lie to you, Officer. I don't have a driver's license, but I do have a state I.D." Garcia then produced his Minnesota state identification card.

Detective Schaffner also asked if the vehicle belonged to Garcia, to which Garcia responded that it did not, but that it belonged to his aunt. Garcia then gave a copy of the title to the vehicle to Detective Schaffner indicating that the vehicle belonged to Suzanne Garcia. The title was issued in Minnesota. Next, because Garcia had said he did not have a driver's license,

---

[2] Unless otherwise noted, all references to "Garcia" are to Fabian Garcia, Jr.

1    Detective Schaffner asked Machacek if he had a driver's license. Machacek had an Arizona

2    driver's license, which he gave to Detective Schaffner.

3    Detective Schaffner testified that Garcia and Machacek appeared to be extremely nervous

4    during this questioning. Detective Schaffner stated that he made this conclusion from observing

5    that Garcia was rocking his legs back and forth, appeared to have a hard time swallowing, and

6    appeared to have a dry mouth, and that both Garcia's and Machacek's hands shook when they gave

7    Detective Schaffner their identification. After hearing and observing the testimony at the

8    evidentiary hearing, the Court does not find this testimony about these individuals being unusually

9    or even exceptionally nervous to be credible. Based upon its assessment of Detective Schaffner's

10   testimony, the Court finds that while Garcia and Machacek may have appeared nervous during the

11   stop, they were not demonstrably more nervous than a person would ordinarily be when stopped

12   by the police. The Court finds that Schaffner's testimony about the difference he ascribes to the

13   level of nervousness of Garcia and Machacek does not support an actual finding of difference in

14   the level of nervousness between these two and other drivers he has stopped.

15   Detective Schaffner then returned to his vehicle to run a records check on Garcia and

16   Machacek in Metro's records section as well as a database maintained by the Federal Bureau of

17   Investigation (FBI). The records check took approximately ten to fifteen minutes to complete.

18   From the records check, Detective Schaffner learned that Garcia had been arrested twice in the

19   previous year. In April of 2012 (eleven months before the subject incident), Garcia was arrested

20   for manufacturing methamphetamine. In October of 2012 (six months before the subject incident),

21   Garcia was arrested for possession of marijuana. Based on the information available to Detective

22   Schaffner, these were only arrests, not convictions.

23   While Detective Schaffner was conducting the records check, his supervisor, Sergeant

24   Mike McGrath, arrived on the scene. Sergeant McGrath came to the scene after hearing that

25   Detective Schaffner was conducting a stop on the radio used by task force members. After he got

26   off the phone for the records check, Detective Schaffner told Sergeant McGrath that he "thought

27   [he] had something here" and that he was going to ask Garcia for consent to search the vehicle.

28

Detective Schaffner returned to Garcia's vehicle and asked Garcia to step outside and speak to him. When Garcia exited his vehicle and approached the police vehicle, Detective Schaffner handed him his Minnesota ID card, Machacek's Arizona driver's license, and the vehicle title that Garcia had given him. Detective Schaffner warned Garcia to maintain his lane, not to speed, and to make sure that Machacek drove the vehicle because Garcia did not have a license. Garcia thanked Detective Schaffner, turned around, and started walking back toward his vehicle. Based on Detective Schaffner's testimony, this concluded his traffic stop investigation.

When Garcia had almost reached the door to his vehicle, Detective Schaffner called out to him. Garcia stopped and turned around. Detective Schaffner told Garcia that he had more questions for him. He instructed Garcia to walk back toward him. At Schaffner's direction, Garcia walked back toward Detective Schaffner.

Detective Schaffner asked Garcia if he had any contraband in his vehicle, such as guns, drugs, or explosives. Garcia said no. Next, Detective Schaffner asked if Garcia had any large amounts of currency in his vehicle. Again, Garcia said no. Detective Schaffner then asked if Garcia had any illicit U.S. currency in his vehicle, and explained that by "illicit" he meant money that was obtained by illegal means. Garcia again said no. Detective Schaffner asked if he could search Garcia's vehicle. Garcia refused, telling Detective Schaffner he did not feel comfortable because it was not his car. Detective Schaffner asked if everything in the vehicle belonged to Garcia and Machacek, to which Garcia answered yes. Detective Schaffner then immediately went back to his vehicle and retrieved his narcotic detector dog, Sally. He brought Sally to Garcia's car and Sally began sniffing the exterior of the vehicle. Approximately one minute passed from the time Garcia refused to allow Detective Schaffner to search his vehicle to the time Sally began sniffing the vehicle's exterior.

Sally began sniffing at the rear driver's side bumper of the vehicle and proceeded to sniff the vehicle and all its seams, moving in a counterclockwise direction. When she approached the front passenger-side door, Sally began to sniff more aggressively. She went up on her hind legs and placed her paws on top of the door. The front passenger-side window was rolled down, and

Sally placed her nose inside the vehicle and sniffed. She then stopped sniffing, became still, and stared straight ahead—a sign that she had "alerted" to the odor of a controlled substance.

Detective Schaffner then secured Sally in her kennel inside his vehicle, returned to Garcia's vehicle, and told Garcia and Machacek that Sally had detected the odor of a controlled substance in their vehicle. He asked Garcia and Machacek if there were any drugs in the vehicle; Garcia answered that there were not. Detective Schaffner asked whether Garcia or Machacek was using drugs inside the vehicle. In response, Machacek stated that he had previously smoked marijuana in the vehicle.

Detective Schaffner then began to search the vehicle by hand while Sergeant McGrath stood by with Garcia and Machacek. In the center console of the vehicle, which had a top and was closed, Detective Schaffner found two or three bundles of U.S. currency, folded in various shapes and wrapped in rubber bands. The currency was in small denominations. Detective Schaffner asked Garcia and Machacek who the money belonged to, and Machacek answered that it was his. In the backseat of the vehicle, behind the white bucket that appeared to contain vomit, Detective Schaffner found a black backpack. Detective Schaffner unzipped the backpack and found several more bundles of U.S. currency folded and wrapped in the same way as the bundles in the center console. Detective Schaffner asked Garcia and Machacek who the backpack belonged to, and Garcia answered that it was his. Detective Schaffner searched the rest of the vehicle and found nothing.

At 10:21 p.m., approximately one hour after Detective Schaffner had initially stopped Garcia and Machacek, Detective Jake Frampton arrived on the scene. Detective Frampton is employed by the Henderson Police Department and is also a member of the task force. Detective Frampton retrieved three boxes from his vehicle and placed them on the side of the road approximately three feet apart, with the currency obtained from Garcia's vehicle under one of the boxes. Detective Schaffner then deployed Sally again. She began sniffing the boxes and alerted to the center box. Detective Frampton told Detective Schaffner that the box that Sally had alerted to was the box with the currency in it. Detective Schaffner seized the currency and left the scene at

1    10:55 p.m., approximately an hour and a half after stopping Garcia and Machacek. Garcia was not

2    given a ticket for speeding or for failing to maintain his driving lane.

3         While there was some additional testimony presented at the evidentiary hearing relating to

4    what was said after Detective Schaffner found the currency in the vehicle, the Court does not find

5    that testimony relevant to the suppression issue before it.

6

7    **IV.    LEGAL STANDARD**

8         Under Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset

9    Forfeiture Actions, "[i]f the defendant property was seized, a party with standing to contest the

10   lawfulness of the seizure may move to suppress use of the property as evidence." A motion to

11   suppress brought by a claimant in a civil forfeiture proceeding is akin to one brought by a defendant

12   in a criminal case, and the Fourth Amendment and exclusionary rule are therefore both applicable

13   in such proceedings. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 696–702 (1965);

14   United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1164 (9th Cir. 2008); see also 18

15   U.S.C. § 981(b)(2)(B) (requiring that seizures be made pursuant to a warrant or based upon

16   probable cause and pursuant to a lawful arrest or search).

17        The exclusionary rule "bars the admission of evidence obtained in violation of the U.S.

18   Constitution, as well as 'fruits of the poisonous tree.' [U]nder the 'fruits of the poisonous tree'

19   doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the

20   illegality and is inadmissible." $493,850.00, 518 F.3d at 1164 (citation omitted) (alteration in

21   original). The government bears the burden of showing that a warrantless search was not in

22   violation of the Fourth Amendment. United States v. Scott, 705 F.3d 410, 416 (9th Cir. 2012);

23   United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1058 n.15 (9th Cir. 1994) (applying

24   this burden to civil forfeiture proceedings), superseded by statute on other grounds as stated in

25   United States v. $80,180.00 in U.S. Currency, 303 F.3d 1182, 1184 (9th Cir. 2002).

26

27   **V.    DISCUSSION**

28        Based on the facts of this case and the applicable law, the Court finds that the exterior sniff

of Garcia's vehicle and the subsequent search were in violation of the Fourth Amendment. The fruits of that unlawful search must therefore be suppressed.

### A. Applicable Law

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Stopping an automobile and detaining its passengers, even briefly, constitutes a "seizure" under the Fourth Amendment and requires that the official have "individualized reasonable suspicion of unlawful conduct to carry out such a stop." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (internal quotation marks omitted). "Reasonable suspicion is defined as a particularized and objective basis for suspecting the particular person stopped of criminal activity. This assessment is to be made in light of the totality of the circumstances." United States v. Cotterman, 709 F.3d 952, 968 (9th Cir. 2013) (citation and internal quotation marks omitted).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez v. United States, 135 S.Ct. 1609, 1614 (2015) (citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. (citation and internal quotation marks omitted) (alteration in original). These tasks include determining whether to issue a traffic ticket, checking the driver's license and proof of insurance, checking whether the driver has outstanding warrants, inspecting the vehicle's registration, and other "ordinary inquiries incident to [the traffic] stop." Id. at 1615 (alteration in original) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). Although an officer is not prohibited from conducting inquiries during a traffic stop that are unrelated to the purpose for the stop, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez, 135 S.Ct. at 1615.

**B.  The Officer Lacked the Reasonable Suspicion Required to Extend the Stop**

Based on its analysis of the evidence presented in this case, the Court finds that Detective Schaffner prolonged the stop of Garcia and Machacek beyond the time needed to effectuate its purpose without the independent reasonable suspicion required to do so. The evidence seized as a result of the prolonging of the stop was seized in violation of the Fourth Amendment and must be suppressed.

The Court has found that the traffic stop in this case was completed when Detective Schaffner handed the documents back to Garcia, warned him not to speed and to maintain his lane, and instructed him to make sure that Machacek drove the car because Garcia did not have a license. Schaffner then prolonged the stop by directing Garcia to come back to answer a few more questions.

It is also unquestioned that a dog sniff, unlike asking for an individual's driver's license or registration, is "a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing" and is not an ordinary part of a traffic stop. Rodriguez, 135 S.Ct. at 1615 (internal quotation marks omitted). By deploying Sally and conducting a sniff of the vehicle, Detective Schaffner prolonged the stop beyond the time necessary to complete the mission of the traffic stop. Therefore, the question is whether, based on the totality of the circumstances at the time Garcia refused consent to search and Sally was deployed, Detective Schaffner had "independent reasonable suspicion justifying this prolongation." United States v. Evans, 786 F.3d 779, 787 (9th Cir. 2015).

The government argues that three articulable factors support a finding that Detective Schaffner had reasonable suspicion to prolong the stop. First, the government points to the fact that Garcia's records check revealed two narcotics-related arrests in the past year. Second, the government argues that Garcia had an unusually nervous demeanor throughout his encounter with Detective Schaffner. Third, the government notes that Garcia was traveling from Minnesota, a known drug "user" state, to California, a known drug "source" state. Analyzing these factors in combination and considering the totality of the circumstances of this case, the Court finds that they do not constitute reasonable suspicion for continuing to detain Garcia and Machacek.

***1.  Previous Arrests***

"Although a prior criminal history cannot alone establish reasonable suspicion or probable cause to support a detention or an arrest, it is permissible to consider such a fact as part of the total calculus of information in these determinations." Burrell v. McIlroy, 464 F.3d 853, 858 n.3 (9th Cir. 2006). Although the Ninth Circuit has not explicitly addressed whether arrests, without accompanying convictions, may be considered in the reasonable suspicion calculus, it has implicitly found them to be relevant. See, e.g., United States v. Perez, 603 F. Appx. 620, 621-22 (9th Cir. 2015) (holding, in an unpublished opinion, that information that the registered owner of a vehicle had previously been arrested for smuggling and was involved in a smuggling-related seizure, along with information that a border patrol alert had been issued regarding one of the passengers in the vehicle, was relevant and probative to the reasonable suspicion analysis).

Here, Detective Schaffner's records check revealed that Garcia had been arrested twice in the year preceding the stop, once for manufacturing methamphetamine and once for possession of marijuana. This information was validly considered as part of the reasonable suspicion calculus. However, given that Detective Schaffner's records check did not indicate that either of those arrests had resulted in a conviction, the Court accords this factor little weight in the overall analysis.

### 2. Nervousness

Similarly, nervous behavior is not in itself sufficient to create reasonable suspicion, but is a factor that may be considered in the analysis. United States v. Perez, 37 F.3d 510, 514 (9th Cir. 1994), overruled on other grounds by United States v. Mendez, 476 F.3d 1077, 1080 (9th Cir. 2007); see also United States v. Crapser, 472 F.3d 1141, 1156 (9th Cir. 2007) (holding that, while nervousness may be considered as part of the totality of circumstances, nervousness standing alone was insufficient to expand a Terry stop into an inquiry into drug activity).

The government contends that Garcia's extreme nervousness contributes to a finding that Detective Schaffner had reasonable suspicion to prolong the stop. As stated above, however, the Court does not credit Detective Schaffner's testimony that Garcia was more nervous than is typically the case in these types of traffic stops. Similarly, the Court does not credit Detective Schaffner's testimony that Garcia became noticeably more nervous when, after his travel

1   documents had been returned to him, he was asked whether he had any illicit U.S currency in his

2   vehicle. These findings are based on the Court's observations and assessment of the consistency

3   and credibility of Detective Schaffner's testimony on these points. The Court therefore does not

4   attribute any weight to this factor.

5                                    *3. Route of Travel*

6           Finally, the fact that an individual is traveling to a "known drug hub" can be considered as

7   part of the reasonable suspicion determination. <u>Perez</u>, 37 F.3d at 514 (internal quotation marks

8   omitted). However, the Court does not find this factor relevant to the analysis in this case for two

9   reasons.

10          First, based upon its observations at the evidentiary hearing, the Court does not credit

11  Detective Schaffner's testimony that he considered the origin and destination of Garcia's journey

12  before deciding to prolong the stop to deploy Sally.

13          Second, the Court does not find Detective Schaffner's explanation of how he determined

14  Minnesota to be a user state, or California to be a source state, to be compelling or persuasive.

15  This testimony was general and not based upon sufficient evidence or information.

16          Moreover, the government presented no evidence that cars traveling from Minnesota or to

17  California through Nevada on I-15 are actually more likely to be carrying illicit currency than cars

18  traveling to and from other states. The government's argument with respect to this factor rests on

19  the extremely broad theory that, because the majority of Schedule I controlled substances are

20  manufactured south of the U.S.-Mexico border, California and other states that border Mexico are

21  "source" states. But the government presented no evidence, beyond a few vague statements by

22  Detective Schaffner, to support this theory or to demonstrate how it connects to this case. Thus,

23  the Court finds that the government did not present credible evidence or testimony to establish that

24  Detective Schaffner had any reason to believe that Garcia was *actually* more likely than any other

25  motorist to be carrying illicit currency or contraband.

26          Considering the totality of the circumstances, Detective Schaffner's decision to prolong

27  the stop of Garcia and Machacek by deploying Sally was not supported by independent reasonable

28

suspicion. The evidence obtained subsequent to the deployment of Sally was obtained in violation of the Fourth Amendment and must therefore be suppressed. $493,850.00, 518 F.3d at 1164.

## VI.    CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Claimants Fabian Garcia, Jr. and Fabian Garcia, Sr.'s Motion to Suppress (ECF No. 22) is GRANTED.

**DATED**: July 28, 2016.

_____

**RICHARD F. BOULWARE, II**
**United States District Judge**